## DETERMINED IN THE

# SUPREME COURT

### OF

# WASHINGTON

[No. 15531. Department Two. April 7, 1920.]

FLORENCE FISH COMPANY, *Respondent*, v. EVERETT
PACKING COMPANY, *Appellant*.[1]

EVIDENCE (179) — PAROL EVIDENCE—SHOWING INTENT—EXPLANA-
TION OF NAUTICAL TERMS. In an action upon a fishing contract oral
evidence of experienced fisherman as to the meaning and the duties
in those waters of a "boat to stand by," which the company had
agreed to furnish to the fishing boat, is admissible as explanatory of
technical words or those having a general meaning and a meaning
peculiar to the business.

STIPULATIONS (2)—CONSTRUCTION—ADMISSION OF EVIDENCE. A
stipulation that the conversations leading up to a fishing contract
about the use and purpose of a "stand-by boat" to be furnished may
be admitted without objection, does not preclude a party to it from
offering further evidence as to the meaning of the terms "stand by."

DAMAGES (66, 74)—MEASURE OF DAMAGES—BREACH OF CONTRACT—
LOSS OF PROFITS—COMPUTATION. The measure of damages through
breach of a contract to furnish a "boat to stand by" to assist in
fishing operations, is the loss in catch which would have been made
if the boat had been furnished, where on repeated demands promises
were made to furnish the boat and a boat was furnished for but
five days out of eighteen days of fishing; since the conduct was
such as to mislead plaintiff.

SAME (113)—EVIDENCE—LOSS OF PROFITS—BREACH OF FISHING
CONTRACT—ESTIMATES—ADMISSIBILITY. Upon an issue as to the
damages for breach of a contract to furnish a "boat to stand by" to
assist a fishing boat, evidence of the catch on days when the assist-

[1]Reported in 188 Pac. 792.

ance was furnished, and on other days when compelled to fish without it, is admissible to show the loss in the catch, it appearing that the fish were running in great schools which had to be avoided and could not be handled without the aid of the stand-by boat.

Appeal (487)—Decision—Matters Determined—Segregation of Damages. Where the jury segregated the damages on different causes of action, error as to one will not cause a reversal as to the other, and a new trial will be confined to the one reversed.

Appeal from a judgment of the superior court for Snohomish county, Alston, J., entered April 1, 1919, upon the verdict of a jury rendered in favor of the plaintiff, in an action on contract, after a trial on the merits. Affirmed in part and reversed in part.

*Kerr & McCord, Stephen V. Carey,* and *Cooley, Horan & Mulvihill,* for appellant.

*Ballinger, Battle, Hulbert & Shorts,* for respondent.

Fullerton, J.—In September, 1918, the respondent, Florence Fish Company, and the appellant, Everett Packing Company, each a corporation organized under the laws of this state, entered into the following contract:

"This Agreement, made and entered into this.......... day of September, 1918, by and between The Florence Fish Company, a corporation, with its principal place of business at Seattle, Washington, party of the first part, and the Everett Packing Company, a corporation, doing business at Everett, Washington, party of the second part,

"Witnesseth: Whereas, the party of the first part is the owner of that certain gasoline fishing boat named 'Anna J.' and is engaged in catching fish for sale; and

"Whereas, the Everett Packing Company is engaged in buying and packing fish and is interested in the National Fish Company of British Columbia; and

"Whereas, the said party of the second part desires the party of the first part to take its said boat to British Columbia on or about October 1st, 1918, and to engage in catching fish for the National Fish Com-

pany of British Columbia, and to continue the catching of fish up to November 1st, 1918;

"Now, therefore, for the consideration hereinafter mentioned, the parties hereto agree as follows:

"The party of the first part will take its said fishing boat 'Anna J.' to British Columbia waters and will engage in catching fish from about October 1st to November 1st, 1918, and will deliver said fish as caught into scows of the National Fish Company of British Columbia at or near the fishing grounds; said scows to be placed and furnished by said National Fish Company.

"*It is further agreed that the party of the second part through said Fish Company will keep during said fishing season a gasoline boat to stand by to assist the party of the first part in case it needs help or assistance in any particular.*

"The above named boat 'Anna J.' is registered in the United States, and it is agreed that the party of the second part shall assume the entire responsibility itself, or through the said National Fish Company, of procuring the registration or permission or license to operate and fish in the waters of British Columbia, and said second party agrees to pay all costs and expenses in connection therewith.

"The ordinary method of operating a fishing boat of the character of the 'Anna J.' is as follows:

"Seven (7) men are employed on said boat and the proceeds from the entire catch of fish is divided into eleven (11) parts, one part going to each man and four parts to the boat.

"It is agreed that the party of the second part will pay twenty cents (20c) apiece for all dog salmon caught by the party of the first part through the operation of its said fishing boat, and that the proceeds from said fish shall be divided as above stated; provided, however, it is agreed that the party of the second part hereby guarantees to the party of the first part at least sixteen hundred dollars ($1,600) for its four (4) shares. In other words, it is agreed that in case the four shares of the entire catch for the period above mentioned amounts to less than sixteen hundred

dollars ($1,600) the party of the second part will make up the difference so that the boat will receive not less than sixteen hundred dollars ($1,600) for its operation during said period, and in case the four shares amount to more than sixteen hundred dollars ($1,600), the said party of the first part is to receive the full amount of said four shares.

"It is further agreed that the party of the second part will pay for the fuel or gasoline consumed by said boat during the time it is engaged in said fishing in British Columbia waters.

"It is further mutually understood and agreed that in case the Canadian Government should, during the life of this contract, promulgate any orders or restrictions covering the fishing industry which would in any manner interfere with the successful operation of said boat 'Anna J.' in British Columbia waters in such fishing industry, then and in that event it is agreed that said boat may be transferred to Puget Sound waters during the remainder of the period covered by this contract, and the fish caught during said latter period to be delivered to the Everett Packing Company or its scows. It being understood thereby that conditions governing the taking of fish from British Columbia waters shall remain as they now exist. Everett Packing Company to pay market price for fish caught in Puget Sound waters.

"In witness whereof, this agreement has been executed in duplicate the day and year first above written.
                    "The Florence Fish Company,
                        "By Edw. E. Snekvik.
                    "Everett Packing Company,
                        "By J. O. Morris."

After the execution of the contract, the respondent caused its boat to proceed to the waters named, where it arrived on the afternoon of October 3rd. From that time until the end of the month, the boat engaged in fishing, and during that time fish were caught and delivered, which at the agreed price entitled the respondent to the sum of $15,452.40. Of this sum, $420 was paid, leaving a balance due of $15,032.40.

In this action, the respondent sues not only to recover the balance due on the price of the fish, but sues in damages as for a breach of the clause of the contract which we have italicized, averring in his complaint with reference thereto that the appellant did not keep a boat to stand by and assist the respondent when it needed help and assistance during any part of the time its boat was engaged in fishing except for about three days, and that it was damaged by reason thereof in the sum of $5,000. The answer of the defendant put in issue the allegations of the complaint as to the amount due for the fish caught, and the allegations with respect to the breach of the contract and the damages alleged to have been suffered; and by an affirmative defense pleaded a performance of the contract on its part. The cause was tried by the court sitting with a jury, and resulted in a verdict in favor of the respondent,

"for fish caught and delivered at $15,032.40 with interest thereon at the rate of six per cent per annum from November 1, 1918, and also for the sum of $5,000 on account of damages sustained by reason of the breach of the contract."

Judgment was entered in accordance with the verdict, and the appeal is from the entire judgment.

There was no controversy in the court below, nor is there in this court, over the right of the respondent to recover for the fish caught; the sole controversy being over the right to recover in damages. On this branch of the case, the appellant makes three principal contentions; first, that the court erred in the admission and exclusion of evidence; second, that it erred in that it applied a wrong measure of damages; and third, that it erred in its instructions to the jury.

To an understanding of the first of these contentions, a reference to certain matters in the record is neces-

sary. In support of its cause of action, the appellant called the captain of the fishing boat as a witness. This person was an officer of respondent, and represented it in the negotiations which led up to the execution of the contract. During the course of his examination, he was asked whether in these preliminary negotiations he had talked with the representative of the appellant regarding the necessity of a stand-by boat while fishing in the waters in which he was contemplating fishing, and answering in the affirmative, was further asked whether prior to that time he had "learned anything about the necessity of the use of a stand-by boat in doing fishing over in those waters." At this point, counsel for the appellant interrupted, when the following colloquy occurred:

"Mr. Carey: I think it would be well now to have an understanding. I understand, from the drift of this examination, that you concede that this contract is subject to explanation by oral testimony?

"Mr. Hulbert: I think so, your honor please. That is the position that we have taken—have taken all the way through. I think it is right. I think inasmuch, if your honor please, as the contract simply provides— I will read, now, that portion of the contract that is in dispute so we will have it thoroughly before the court and jury. This is the provision that provides for the stand-by boat:

" 'It is further agreed that the party of the second part through said National Fish Company will keep during said fishing season a gasoline boat to stand by to assist the party of the first part in case it needs help or assistance in any particular.'

"Now then, the position that I think the defense can take in this case, which I think is right, is that, under that statement in the contract, that the question of just what is the purpose of a stand-by boat are questions that should be explained—gone into. They have taken that position, and we have agreed with them on that, in settling of the pleadings all the way through,

and I think it is clearly so under the ruling of the court on that matter—that the purpose and use of a stand-by boat would not be fully explained in the contract.

"The Court: Well, I haven't any doubt about that, but I want this understood—I want to understand you on this. Do you both concede that, in determining the purposes and uses of a stand-by boat, you can go into the conversations had between the parties in negotiating the contract with reference to that particular boat? That is a different question.

"Mr. Hulbert: Yes, sir, that is a different question, your honor please. I have serious doubts, your honor please, whether or not that can be done.

"The Court: Well, I want it agreed upon or determined whether or not the court must pass on that as a question of law or whether the parties will agree that each one may produce testimony of those who are familiar with the execution of the contract as to what was said during the negotiations with reference to the use to which the stand-by boat would be put. Does the stipulation extend that far or does it—

"Mr. Hulbert: I don't—I am inclined to think that the court's intimation is a correct one—that the defendant here agreed to furnish a stand-by boat. Now then, what the conversation was before or after or at the time of signing the contract as to what they were going to use this stand-by boat for may not be competent. The only question then would be the custom and the usage, etc., to show what was meant by stand-by boat among the fishermen or people engaged in that line of business.

"The Court: I would have no hesitation in holding that that could be explained, what was meant by that and what they were usually used for. That I have no doubt about. You may proceed.

"Mr. Hulbert: Well, I want— It would be a good time to have the question settled now, because—

"The Court: Very well.

"Mr. Hulbert: What do you think about it?

"Mr. Carey: I think we had better have the whole story as to what was said and done.

"Mr. Hulbert: I do not want to get any error in the case, your honor please.

"The Court: Well, it would not be error if you both agree to it.

"Mr. Hulbert: Very well. Let the record show, then, that upon this question of the use of a stand-by boat, that it is agreed in open court, by counsel upon both sides that what was said before the entering into of this contract about the use and purpose of the stand-by boat may be admitted, without objection.

"Mr. Carey: The record may so show."

Following this stipulation, the respondent's counsel proceeded to examine the witness then on the stand, and others afterwards called, concerning the conversations had between himself and the appellant's representative as to the use and necessity of a stand-by boat in fishing in the particular waters mentioned, the evidence being to the effect that such a boat was necessary because of the nature of the waters in which the fishing must be done and because also of the peculiar action of the fish. In substance, the evidence tended to show that the stand-by boat had two purposes; the one to hold the fishing boat in place while the net was being hauled in after a cast, and the other to carry the overload of fish, that is, such fish as might be caught in excess of the carrying capacity of the fishing boat. Evidence was also introduced as to the meaning of the term "stand-by boat," as used in those waters, the witnesses testifying that the term was used to designate a boat the purpose of which is to furnish aid to a fishing boat in the manner indicated.

The appellant was also permitted to give its version of conversations had during the preliminary negotiations concerning the purposes of a stand-by boat, as well as the understanding of its officers as to the meaning of the term as used in the contract. Their version, in brief, was that the waters where the fishing was to be

done were at times turbulent, that the place was in the open ocean off a shore having precipitous banks, and that the representative of the respondent was fearful that the fishing boat might, as the result of the hazards commonly following purse seine fishing, become helpless, drift ashore, and be endangered if not lost; that the purpose of the stand-by boat was to assist in cases of this sort, and not to aid it in its fishing operations.

In further support of its contentions with respect to the meaning of the contract, the appellant called a sea captain and proceeded to interrogate him concerning the purposes and uses of a stand-by boat. Objection was made to this testimony and sustained by the court, whereupon the appellant offered to prove by the witness, ''that in marine circles generally, including the salmon fishing business, the term 'stand-by,' or 'stand-by boat,' or 'stand-by service' has a well defined meaning, and means simply a boat not to engage with the seine boat or crew in the operation of fishing or handling the seine, but simply means a boat to be in the vicinity to assist the purse seine boat in case of distress.'' At the conclusion of this offer, the court again sustained the objection, and sustained objections to similar testimony offered by the appellant through other witnesses.

The court sustained the objection for the reason that, in his opinion, the contract was not ambiguous, or subject to explanation by oral testimony; that the terms of the contract, since it required the appellant ''to keep during the fishing season a gasoline boat to stand by to assist the [respondent] in case it needs help or assistance in any particular,'' required the appellant to keep such a boat standing by for the purposes of aiding in the fishing operations of the respondent's boat in instances when it needed such aid as well as in instances

conceded by the appellant; and that to permit the introduction of evidence to show that the meaning of the contract was other than this would be to "admit evidence tending to modify the terms of a written contract."

In this conclusion, it is our opinion that the trial court erred. It is a general rule, of course, that a written contract may not be varied by showing a prior or contemporaneous parol agreement, but it is equally the rule that parol evidence is admissible to define and explain the meaning of words or phrases in a written contract which are technical, or which have two meanings, the one common and general and the other peculiar to the business, craft, or trade to which the contract in which it is used relates. Such evidence does not vary or add to the written contract; it but translates its language from the language of the particular business to the language of the people generally. So in this instance we do not think an ordinary person having only a general knowledge of things nautical or of the fishing business would understand, from a reading of the contract, the purposes of a "stand-by boat," even though the expression is followed by words somewhat explanatory of its meaning. Certainly he would not understand that such a boat was to assist in the ordinary fishing operations of the boat which it was to stand by. That this was the view of the respondent's counsel at the trial, is shown by the quotation we have made from the record. It is shown, also, from the quotation that this was the first impression of the trial judge. The fact that the trial judge afterwards changed his views was not necessarily error, but in our opinion he was right in his first impression and in error in his second.

The respondent argues in this connection that the stipulation entered into limits the testimony on the

question to the preliminary negotiations between the parties, and that the appellant cannot now complain because the effect of the court's ruling was but to hold him to the stipulation, even if erroneous otherwise. But aside from the fact that the respondent did not itself confine its evidence to that form of testimony, we cannot so read the stipulation. As we read it, the respondent did not question the admissibility of the testimony explanatory generally of the expression used, but sought the stipulation for the purposes of testimony which was thought to be of doubtful admissibility. Our conclusion, therefore, is that the court erred in rejecting the proffered testimony.

The second contention is that the trial court permitted testimony of an expert nature from witnesses who did not show proper qualifications to testify on the subjects concerning which they were interrogated. These objections we shall not discuss at length. It is sufficient to say that, under the liberal rules applicable in such cases, no error was committed in this respect.

Another contention is that the court applied a wrong measure of damages. It appeared from the evidence that, of the eighteen days the fishing boat was actually engaged in fishing, a stand-by boat was furnished to assist it for a total period of about five days. The assistance was not continuous for that period of time, but intermittently during the entire period for single days and parts of days at a time, seemingly as the appellant could procure such a boat. As the measure of its damages, the court permitted the respondent to show the number of fish caught on the days when it had the assistance of the stand-by boat, and the number caught on the days when no such assistance was furnished, and permitted, also, the captain of the fishing boat and the members of the crew to give estimates

as to the difference between the number of fish that could have been caught with the aid of the assisting boat and the number actually caught. Against this, the appellant makes two contentions, the first of which is that the measure of damages is not the loss in catch but what it would cost to have procured an assisting boat; and the second, that the testimony is at best but speculative and intangible.

But, contrary to the first branch of the contention, we think the measure of damages is the loss in catch. It cannot be successfully denied that this was the actual loss suffered by the respondent, and usually the actual loss furnishes the measure of recovery. It was, of course, the respondent's duty to minimize its loss as far as possible, and under certain circumstances the rule might have required it of itself to procure an assisting boat. But we think the circumstances shown here excused it. The appellant, according to the evidence it was the privilege of the jury to believe, at no time refused to furnish the assisting boat. Repeated demands were made upon it for such a boat, and at each demand the appellant promised to comply. Its conduct was such as to mislead the respondent, and the jury were warranted in finding that it was so misled.

On the second branch of the objection, certainly the differences in the number of the catch on the days when it had the assisting boat and the days when it did not, furnished a very tangible basis upon which to estimate the acutal loss. Nor was it error to permit those actually engaged in the work and who knew the conditions to give an estimate of such losses. The evidence shows it was not in getting fish within the confines of the cast of the net which caused the difficulty, but that it was caused by getting an overload which could not be successfully handled without the

aid of an assisting boat. Indeed, the evidence discloses that the fish were running in great schools, and that these had to be avoided when the fishing boat was operating without assistance.

Complaint is made of the instructions of the court to the jury. But these seem pertinent to the view the court took of the contract. However, if they are not so, it would serve no purpose to point out their defects, since a retrial must be had upon a theory to which they will be inapplicable.

For the error in the rejection of the proffered testimony, the judgment must be reversed and remanded for a new trial, in so far as it permits a recovery in damages. Since, however, the judgment is severable—that is to say—since it allows a recovery for the fish caught and delivered in one sum and the damages in another, there is no reason for reversing it as an entirety. It will therefore stand affirmed as to the first mentioned sum, and reversed and remanded for a new trial as to the latter. Neither party will recover costs in this court. Let the order be entered accordingly.

HOLCOMB, C. J., BRIDGES, TOLMAN, and MOUNT, JJ., concur.